# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# NO: 3:04CR157

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff<br><br>vs.<br><br>ANDRE MCRAE,<br>    Defendant. | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER IS BEFORE THE COURT** on the Defendant's "Motion to Suppress Evidence and Statements Obtained in Violation of Fourth Amendment" ("Motion to Suppress") (Document No. 63), filed on January 25, 2006, and the "Government's Response in Opposition..." (Document No. 68), filed on February 14, 2006.

The Court held an evidentiary hearing on the Motion to Suppress on March 9, 2006, and the motion is now ripe for disposition. Having fully considered the arguments, evidence, and legal authorities, the Court will respectfully recommend that the Defendant's Motion to Suppress be denied, as discussed below.

## I. BACKGROUND AND FACTUAL FINDINGS

On December 13, 2005, a Superseding Indictment was returned against the Defendant, Andre McRae, alleging eight federal narcotics and firearms offenses--violations of 18 U.S.C. § 922 (g), 18 U.S.C. § 924 (c), 21 U.S.C. § 846, and 21 U.S.C. § 841. The Defendant pleaded not guilty to all counts.

On January 25, 2006, the Defendant filed a motion seeking to suppress drugs, firearms, and

1

statements obtained following two stops of the Defendant on May 17 and 26, 2004. In his motion, the Defendant argues that both stops violated his Fourth Amendment rights because the Charlotte-Mecklenburg police officers who made the stops lacked probable cause. He argues that probable cause was lacking on May 17, 2004, because the stop was ordered by a federal agent who did not make the stop, and because the stop was made by officers who had not independently observed any activity. The Defendant's second argument is that the drugs and weapons, and his statements and consent to search, should be suppressed as fruits of the illegal stop.

An evidentiary hearing was held before the Court on March 9, 2006. ATF Agent Terrell Tadeo, former CMPD officer Abert Fiori, and CMPD officer Matthew Mescan, testified at the hearing.

Agent Terrell Tadeo, a 15-year veteran with the ATF, first learned of the Defendant from Damon Chamberlain, who later became the confidential informant ("CI") in this case. The CI, already a convicted felon, began assisting federal authorities on the Defendant's case subsequent to entering a plea on unrelated federal charges. The CI informed Tadeo that he and the Defendant were best friends, and that the Defendant regularly carried a .40 caliber pistol and sold crack cocaine.

Tadeo organized an undercover drug buy. The plan was for CMPD Detective Ortiz to make a controlled purchase of an ounce of cocaine from the Defendant. To accomplish the buy, Tadeo had the CI inform the Defendant that a Mexican individual had attempted to obtain drugs from him. On April 15, 2004, Tadeo monitored a telephone call between the Defendant and the CI. According to Tadeo, the Defendant discussed selling marijuana and cocaine and owing a Dominican source $3,200.

On April 16, 2004, Ortiz contacted the Defendant and arranged to purchase an ounce of

cocaine from him in a Bi-Lo parking lot that same day. Tadeo and CMPD officers surveilled the scene of the buy, and observed Ortiz and CI arrive in Ortiz's unmarked car. They observed the Defendant in a gold Tahoe SUV. Shortly thereafter, the Defendant sold Ortiz an ounce of cocaine in Ortiz's car. Instead of arresting the Defendant at the scene, Tadeo decided to plan a larger drug buy. A larger buy was later attempted but failed.

On April 22, 2004, Tadeo received certified records from the North Carolina Department of Corrections, reflecting that the Defendant had four felony drug and robbery convictions in 1993 and 1994. At this point in time, Tadeo (1) had information from the CI that the Defendant regularly carried weapons and sold drugs, (2) possessed confirmation of the Defendant's drug and robbery convictions, and (3) had personally observed the Defendant sell an ounce of cocaine to Detective Ortiz one week earlier.

*The First Stop*

On May 17, 2004, Tadeo set up and monitored another telephone call between the CI and the Defendant. Tadeo asked the CI to ask the Defendant to supply him with a weapon. The CI called the Defendant at the Defendant's home on a cell phone from the ATF office in a small room the size of a closet. Tadeo recorded the call and sat close enough to the CI to hear part of what the Defendant was saying. When the CI hung up the phone, Tadeo asked the CI to summarize the call. The CI informed Tadeo that the Defendant was going to bring a "three-pound" to him in about an hour, and that a "three-pound" referred to a .357 magnum.

The recording of this conversation is difficult to understand but the words are audible. The recording and the transcript thereof prepared by Tadeo independently reflect that the CI asked the Defendant "you gonna let me hold that three pound man?" The CI stated that he just wanted to hold

3

it. The CI asked the Defendant this question twice. The Defendant responded in the affirmative, and told the CI that he would meet him in about an hour at "Shauna's house."

Tadeo gathered some CMPD officers with the intention of intercepting the Defendant en route to Shauna's house. Tadeo briefed the officers very quickly behind a Harris Teeter grocery store in the University area. Officer Mescan had already received some information about the case prior to arriving at the scene from Detective Julie Barry, who had been working the case with Tadeo. Barry had informed Mescan that there was confidential, reliable information that the Defendant would be transporting weapons and drugs, and she asked the officers to assist Tadeo. Tadeo testified that he informed the officers that the Defendant was a convicted felon, was expected to be carrying a .357 magnum and regularly carried a .40 caliber pistol and drugs, and that the Defendant had previously purchased cocaine from an undercover detective the week before. Tadeo informed the officers that he was using a CI, and instructed them to develop their own basis for stopping the Defendant to protect the CI's identity.

Tadeo positioned himself at the exit of Johnston-Oehler Road at Mallard Creek, where he expected to observe the Defendant. Marked units, including Officers Mescan and Fiori, were in the area. Tadeo observed the Defendant's gold Tahoe leave his neighborhood and ordered the officers to make the stop. Fiori and Mescan stopped the Defendant and informed him that he was stopped for illegal window tint. In fact, the Defendant's windows were tinted to such an extent that Fiori and Mescan could not tell how many occupants were in the vehicle. Tadeo remained about 50 yards away and did not approach the scene. The officers informed Tadeo that marijuana was found on the Defendant, and that about an ounce of cocaine, a .357 magnum, and a .40 caliber weapon were found in his console. Tadeo directed the officers to arrest him.

4

The Defendant was transported to the Law Enforcement Center and Tadeo interviewed him after providing Miranda warnings. The Defendant waived his rights under Miranda, and then detailed a cocaine and crack cocaine drug conspiracy operating in Charlotte. The Defendant informed Tadeo that he had sold 23 kilos of cocaine from February 2004 through May 17, 2004. He also admitted to Tadeo that the crack cocaine found in the Tahoe was his and that he always carried the .40 caliber pistol in his vehicle.

Tadeo felt that he had established good rapport with the Defendant and believed that his assistance would be critical to furthering his investigation. He decided to release the Defendant on the Defendant's agreement to call him and to begin working on his drug source. Tadeo made several attempts to call the Defendant, but his calls went unreturned. As a result, Tadeo decided to obtain a warrant for the Defendant's arrest.

*The Second Stop*

On May 26, 2004, Tadeo prepared an affidavit, criminal complaint, and federal warrant for the arrest of the Defendant, which U.S. Magistrate Judge Carl Horn, III, signed on the same day. Tadeo drove to the University area to surveil the Defendant's residence, observed his gold Tahoe en route, and stopped the Defendant after following his vehicle for several miles. The Defendant fled the scene and Tadeo gave chase and successfully apprehended him and placed him under arrest. When they returned to the Defendant's vehicle, Tadeo instructed officers to search it incident to the Defendant's arrest. The officers also obtained the Defendant's written consent to search the vehicle. The search uncovered another firearm and about an ounce of crack cocaine in the console.

**II. ANALYSIS AND LEGAL CONCLUSIONS**

The Defendant's threshold argument is that Officers Fiori and Mescan did not possess

sufficient information from which to develop articulable and reasonable suspicion to stop the Defendant's vehicle, and that suspected illegal window tint was not a valid basis. According to the Defendant, for the May 17th stop to have been legal, either Agent Tadeo needed to make the stop personally, or Fiori and Mescan needed to know everything Tadeo knew at the time they stopped the Defendant. The issue before the Court is whether an appropriate basis existed for stopping the Defendant's vehicle on May 17, 2004. Based on the totality of the circumstances, the Court finds when the officers stopped the Defendant on May 17, they possessed a reasonable, articulable suspicion that the Defendant was transporting weapons and drugs in his vehicle. Accordingly, the evidence obtained as a result of both stops should not be suppressed.

The Fourth Circuit has summarized the law governing the legality of a vehicle stop as follows:

> Under *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot. A *Terry* stop must be based on at least a minimal level of objective justification, but the standard for reasonable suspicion is less demanding than for probable cause. In assessing a *Terry* stop's validity, we consider the totality of the circumstances. Thus, factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together. Moreover, our determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training. While we require more than a mere hunch to justify a stop, we also credit the practical experience of officers who observe on a daily basis what transpires on the street.

United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004) (internal marks and citations omitted) (italics in original). Among the factors that the courts have considered in determining whether reasonable suspicion exists are (1) presence in a high crime area, e.g., Perkins, 363 F.3d at 321; United States v. Christmas, 222 F.3d 141, 145 (4th Cir. 2000); United States v. Sprinkle, 106 F.3d

6

613, 617 (4th Cir. 1997); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); (2) evasive conduct, even if that conduct stops short of "headlong flight," Lender, 985 F.2d at 154; Sprinkle, 106 F.3d at 618; (3) informant tips, including anonymous tips if "accompanied by some corroborative elements that establish the tip's reliability," Perkins, 363 F.3d 323; (4) the lateness of the hour, Lender, 985 F. 2d at 154; (5) knowledge of prior criminal involvement, Sprinkle, 106 F.3d at 617; and (6) the observation of what appears to be a drug transaction or other criminal activity, Lender, 985 F.2d at 154.

With respect to informant tips, the Fourth Circuit has made clear that

> [w]here the informant is known or where the informant relays information to an officer face-to-face, an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion.

Perkins, 363 F.3d at 323 (citations omitted); accord Christmas, 222 F.3d 141, 143-44. Moreover, an unverified tip from a known informant, may be sufficient to support a reasonable suspicion of criminal activity. United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004).

Applying these principles to the facts presented here, the Court finds that the officers and Agent Tadeo had a particularized and objective basis for suspecting the Defendant to be transporting weapons and drugs. On May 17, 2004, at the time Tadeo ordered the CMPD to stop the Defendant, Tadeo either knew or believed that: (1) the Defendant regularly carried weapons and sold drugs including cocaine; (2) the Defendant had at least four felony drug and robbery convictions; (3) the Defendant drove a gold Tahoe SUV and had sold an ounce of cocaine to Detective Ortiz the month before; (4) based on a real-time telephone call between the Defendant and the CI, that the Defendant would be transporting a .357 magnum and would deliver it to the CI at a specific location within an hour of the call; (5) the Defendant was observed driving the Tahoe at the place and time he was

7

expected; and (6) in addition to the .357 magnum, the Defendant would likely possess other weapons and drugs in his vehicle.

It does not matter, as the Defendant contends, that Fiori and Mescan effected the stop, and not Tadeo. United States v. Mobley, 699 F.2d 172, 175 (4th Cir. 1983) (facts known by special agent at whose direction officers stopped the defendant sufficient to give rise to reasonable suspicion). See also United States v. Capelton, 350 F.3d 231, 240 (1st Cir. 2003) (knowledge may be imputed from an agent to officers effecting a stop under the "fellow officer rule"). This is because common sense and practical considerations must guide judgments about the reasonableness of searches and seizures. See e.g., United States v. Sharpe, 470 U.S.675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). It makes little sense from a practical standpoint to base the legitimacy of the stop solely on Fiori or Mescan, rather than on the collective knowledge of all of the officers and Agents who participated directly in carrying out the stop. See United States v. Cook, 277 F.3d 82, 86 (2002). This is especially true in light of the potential for violence and the difficulty involved with organizing and effecting an investigative stop of this nature. In this case, common sense suggests that since Fiori and Mescan were jointly involved with Tadeo in effecting a Terry stop of the Defendant, Tadeo's knowledge and beliefs regarding the Defendant should be imputed to them.

Based on the foregoing, and considering the totality of the circumstances, the Court concludes that there was reasonable suspicion to stop the Defendant and that the vehicle stop on May 17, 2004 was lawful under Terry.[1] The Court summarily rejects the Defendant's argument that the second stop of the Defendant, on May 27, 2004, was without probable cause because Tadeo stopped

---

[1] The Defendant also attacks the pre-textual basis of the officers' decision to stop the Defendant–illegal window tint. In view of this Court's recommendation regarding reasonable suspicion, it is unnecessary to address the officers' alternative justification for the stop.

and arrested the Defendant under the authority of a properly supported and executed federal complaint and warrant. Because both stops of the Defendant comported with the constitutional requirements of the Fourth Amendment, the Court finds that the weapons, drugs, and statements should not be suppressed on the grounds advanced by the Defendant in his motion.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the Court respectfully recommends that the Defendant's Motion to Suppress (Document No. 63), filed on January 25, 2006, be **DENIED**.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this memorandum must be filed within ten (10) days after service of same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Graham C. Mullen.

Signed: April 14, 2006

_____
David C. Keesler
United States Magistrate Judge