**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:11cv22-FDW**
**(3:04-cr-157-FDW-DCK-1)**

| | | |
|---|---|---|
| **ANDRE MCRAE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **ORDER** |
| **vs.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence, (Doc. No. 1); Respondent's Motion for Summary

Judgment, (Doc. No. 6); Petitioner's Response to Respondent's Motion for Summary Judgment,

(Doc. No. 19); Petitioner's Motion for Reconsideration, (Doc. No. 20); Petitioner's Motion for

Evidentiary Hearing, (Doc. No. 23); Petitioner's Motion for Judicial Notice for Consideration of

Recent Supreme Court Decision, (Doc. No. 24); and on Petitioner's Motion for Entry of Default,

(Doc. No. 25).

## I.    BACKGROUND

In 2004, Petitioner's "best friend" and confidential informant Damon Chamberlain (the

"CI") identified Petitioner as a source for illegal drugs.[1]   The CI was working with Bureau of

Alcohol, Tobacco and Firearms ("ATF") Special Agent Terrell Tadeo ("SA Tadeo") in an

investigation of drug-trafficking in the Charlotte-Mecklenburg area as a condition of his own

plea agreement.   On April 15, 2004, the CI called Petitioner to see if Petitioner would sell him

_____

[1] For record citations to background facts, see the Government's brief in response to Petitioner's
motion to vacate.  (Doc. No. 5).

1

drugs. This recorded call was made under SA Tadeo's supervision. SA Tadeo and the CI created a ruse in which the CI told Petitioner that one of the construction workers in the apartment complex near Petitioner's house wanted to buy cocaine. Petitioner agreed to meet the CI and the construction worker the next day to sell crack cocaine to the construction worker.

On April 16, 2004, the CI and an undercover Charlotte-Mecklenburg Police Department ("CMPD") officer, Detective Rolando Ortiz—posing as the construction worker—met Petitioner in the parking lot of a Bi-Lo grocery store. Detective Ortiz wore a body wire to record and transmit the conversation during the transaction (hereinafter the "Bi-Lo recording"). During the meeting, Petitioner produced some amount of crack cocaine for Detective Ortiz's inspection. When Detective Ortiz discovered that Petitioner had "shorted" the weight of the crack cocaine, Petitioner agreed to increase the amount to the 28 ounces that was ordered. SA Tadeo did not arrest Petitioner at this time because he hoped that Petitioner could lead the investigation to a larger drug sale and source.

Petitioner, a previously convicted felon, was known to carry a .40 caliber Glock handgun. SA Tadeo asked the CI to call Petitioner to see if Petitioner would sell him a gun. On May 17, 2004, the CI placed a phone call to Petitioner under SA Tadeo's supervision. The CI told Petitioner he had been in a fight and needed a gun to protect himself. The CI asked Petitioner if he could get him a "three-pounder," slang for a .357 magnum handgun. Petitioner agreed to supply the gun and promised to bring it to the CI later that day. SA Tadeo asked that CMPD patrol officers stop Petitioner's SUV while en route to meet the CI with the .357 magnum handgun.

SA Tadeo told CMPD officers that: (1) Petitioner was a convicted felon; (2) Tadeo had monitored a conversation earlier that day between Petitioner and the CI wherein Petitioner

2

agreed to furnish the CI with a .357 magnum firearm; (3) Petitioner was known to regularly carry a .40 caliber firearm; and (4) there may be drugs in the vehicle, as Petitioner had previously sold crack cocaine to an undercover CMPD officer. CMPD officers also knew that Petitioner drove a gold-colored, Tahoe sport utility vehicle ("SUV"), which would be in the area near the University of Charlotte. However, to protect the identity of the CI, SA Tadeo asked the CMPD officers to stop Petitioner's vehicle for their own reasons if possible.

Between 4:00 and 5:00 PM on May 17, 2004, two CMPD officers observed a gold SUV matching the description of Petitioner's vehicle pass their location. The vehicle had dark window tinting in violation of North Carolina's window-tinting law. The CMPD officers stopped Petitioner's SUV for violating the window-tinting law as well as based on the information provided by SA Tadeo. One of the CMPD officers approached Petitioner in the driver's seat and asked if he had any guns or drugs in the car. Petitioner replied that he had "a little bit of weed," which the officer retrieved from Petitioner's pocket.

A second CMPD officer approached the vehicle from the passenger side where he observed a passenger in the front seat and another in the back seat. The officers removed the vehicle occupants and searched the vehicle based on probable cause developed from Petitioner's possession of marijuana and SA Tadeo's information. The officers' search of the vehicle incident to the traffic stop and Petitioner's possession of marijuana revealed two guns—a Glock .40 caliber handgun and a Colt .357 magnum handgun—as well as cocaine in a compartment underneath a console between the front seats.

At SA Tadeo's request, Petitioner was transported to the Law Enforcement Center in Charlotte where SA Tadeo and two CMPD detectives interviewed him. Petitioner waived his

Miranda rights and gave SA Tadeo a detailed description of his involvement in Charlotte's crack cocaine drug trade. Petitioner also outlined an extensive crack cocaine conspiracy operating in the area. He identified his drug source as a person known as "Uncle" and named three other conspirators. Petitioner admitted to SA Tadeo that he sold 23 kilograms of cocaine between February 2004 and May 17, 2004. Petitioner also agreed to actively cooperate with law enforcement under SA Tadeo's supervision. That night, Petitioner placed a call to one of his drug sources in SA Tadeo's presence and discussed drug quality, supplier difficulties, and specific individuals.

SA Tadeo was interested in using Petitioner as an informant. SA Tadeo released Petitioner that night without immediately arresting him, as it would have been difficult to protect Petitioner's identity as an informant if he was sent to jail. As a condition of his release, Petitioner agreed that he would not possess a gun at any time and that he would possess drugs only under SA Tadeo's direct supervision. Petitioner, however, did not cooperate as promised. For over ten days, Petitioner did not respond to SA Tadeo's repeated calls and voice mails. Consequently, on May 26, 2004, SA Tadeo filed a criminal complaint with this Court and was granted an arrest warrant.

At about 10:00 PM on May 26, 2004, SA Tadeo was near Petitioner's residence coordinating plans to apprehend Petitioner when he saw Petitioner's gold-colored SUV drive past him. SA Tadeo followed and activated his blue lights to stop Petitioner's SUV. Petitioner stopped his vehicle, but did not follow SA Tadeo's command to lie on the ground. Instead, Petitioner ran, forcing SA Tadeo to chase him on foot for a quarter mile through an apartment complex and over an eight-foot retaining wall before patrol officers pulled him down.

4

After he was apprehended, Petitioner signed a written consent allowing the search of his gold Tahoe. CMPD detectives searching Petitioner's vehicle found approximately ten grams of crack cocaine and a 9 mm handgun in a compartment under the center console—the same place where the cocaine and firearms were previously found in Petitioner's vehicle. Petitioner pleaded with SA Tadeo for a second chance to cooperate. SA Tadeo still believed Petitioner had valuable information and had undergone a "change of heart." The next morning, SA Tadeo recommended to the prosecutor handling the case that Petitioner be released on bond so he could have a second chance of cooperating.

On May 27, 2004, Petitioner was released from federal custody on an unsecured bond under standard conditions imposed by this Court. That same day, Petitioner agreed to work with SA Tadeo to arrange a drug sale with his supplier, the person known as "Uncle." Petitioner set up a meeting with Uncle at around 3:00 pm. Petitioner was wearing a body wire and the meeting was videotaped. During the recorded meeting, Petitioner and Uncle discussed past drug deals and debts. Uncle appeared willing to sell Petitioner crack cocaine at that time and place. (Id.). Petitioner, however, could be heard telling Uncle they should not do the deal then "because there are police all over the place." Petitioner did appear to make arrangements for Uncle to meet him at a different location later the same evening.

Later that evening, Petitioner met with SA Tadeo to place a call to Uncle in order to arrange the meeting they discussed earlier that day. Although Petitioner repeatedly dialed a cell phone number he claimed was Uncle's on a phone provided by SA Tadeo, neither Uncle nor anyone else answered. The next day, when SA Tadeo checked the number Petitioner was dialing, he realized that it was the CI's number and not the number Petitioner had previously

used to contact Uncle. Petitioner later admitted that he had lied to SA Tadeo and intentionally "ruined the deal" with Uncle. Shortly thereafter, Petitioner was arrested by CMPD on new charges of misdemeanor possession of marijuana and drug paraphernalia and felony possession with intent to sell cocaine, thereby violating the Court-ordered conditions of his release on his federal charges. He also violated his bond by exceeding his curfew and leaving the district without permission. Petitioner was arrested for these violations and, after a hearing, was detained pending trial.

On May 27, 2004, SA Tadeo filed a criminal complaint against Petitioner, charging him with conspiracy to possess cocaine base with intent to distribute, in violation of 21 U.S.C. § 846; possession of a firearm by a convicted felon, in violation of 21 U.S.C. § 922(g); and possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841. (Criminal Case No. 3:04cr157, Doc. No. 1: Criminal Compl.). Petitioner made an appearance before U.S. Magistrate Judge Carl Horn, during which Petitioner stated that he intended to retain counsel. The Court released Petitioner on a $25,000 unsecured bond. (Id., Doc. No. 3: Order Setting Conditions of Release). Petitioner was summoned back to Court three weeks later because he had failed to retain counsel. See (Id., Minute Record, June 17, 2004).

On June 29, 2004, a federal grand jury returned an eight-count Bill of Indictment against Petitioner. (Id., Doc. No. 5: Indictment). Count One charged Petitioner with conspiring with Uncle and four others between January 1, 2004, and May 17, 2004, to possess with the intent to distribute five kilograms or more of cocaine and fifty grams or more of crack cocaine in violation of 21 U.S.C. § 841 and § 846. (Id.). Counts Two, Three, and Six charged possession with the intent to distribute five grams or more of crack cocaine on April 16, May 17, and May 26, 2004,

respectively. (Id.). Counts Four and Seven charged Petitioner with violating 18 U.S.C. § 924(c) by possessing a firearm during and in relation to drug-trafficking crimes on May 17 and 26, 2004, respectively.

Counts Five and Eight charged Petitioner with possession of a firearm by a convicted felon on May 17 and 26, 2004. Also, on June 29, 2004, the Government filed a Notice of Intention to Seek Enhanced Penalties Pursuant to 21 U.S.C. § 851 ("Section 851 Notice"), citing Petitioner's three prior state drug convictions: two on February 17, 1993, and one on March 22, 1994. (Id., Doc. No. 6: Section 851 Notice). The two convictions on February 17, 1993, related to Petitioner's arrest for possession with intent to sell drugs on June 6, 1991, and a separate arrest for possession with intent to sell drugs on December 9, 1992.

Because Petitioner had failed to retain counsel, the Court appointed Attorney Richard Andrew Culler to represent Petitioner at his bond revocation hearing and all future proceedings. However, less than a month later, Petitioner made a motion to have Attorney Culler removed as his counsel. (Id., Doc. No. 14: Motion to Withdraw Counsel). According to Petitioner, Attorney Culler told him "to stop playing games with the Government agents" and advised him he could not win at trial. (Doc. No. 1-2 at ¶ 4: Pet. Aff.). Magistrate Judge Horn allowed Attorney Culler to withdraw as counsel and appointed Attorney Samuel Winthrop. (Criminal Case No. 3:04cr157, Doc. Nos. 16; 17).

Petitioner, however, became dissatisfied with Attorney Winthrop's services as well and requested another counsel. (Id., Doc. No. 23). According to Petitioner, Attorney Winthrop advised him that there was no merit in a motion to suppress that Petitioner wanted to file and recommended that he plead guilty to avoid a longer prison sentence. (Doc. No. 1-2 at ¶¶ 6-10).

On June 16, 2005, Attorney Winthrop was allowed to withdraw and the Court appointed

Attorney Julia Mimms to represent Petitioner.  (Criminal Case No. 3:04cr157, Doc. No. 26).

Petitioner soon became dissatisfied with Attorney Mimms.  Magistrate Judge Horn

summarized the circumstances of Petitioner's third motion for new counsel as follows:

> It's understandable, as I've said many times, when a defendant and a lawyer fall
> out; somehow or another misunderstandings, bad chemistry, and that happens to
> good lawyers and good defendants.  But when we see a pattern where someone
> has three lawyers and can't get along with any of them, we begin to think it's not
> the lawyer's fault, but the defendant's fault, and that is precisely the situation
> here.

(Id., Doc. No. 74 at 2: Inquiry Into Status of Counsel Hearing Transcript).

During the Mimms Inquiry Hearing, Petitioner stated that he told each of his three

lawyers to date—including Attorney Mimms—that he was not going to plead guilty.  (Id., Doc.

No. 74 at 5).  "Whether I get life or ten life sentences for [the conviction on the indictment], I'm

not going to [plead guilty]."  (Id.).  Also, Attorney Mimms described to the Court how she had

gone over the United States Federal Sentencing Guidelines ("Guidelines" or "U.S.S.G.") with

Petitioner, particularly his status as a career criminal.  (Id. at 9; 11-13).  Magistrate Judge Horn

then summarized the applicable statutes and Guidelines for Petitioner.  (Id. at 17).  The Court

granted Petitioner's request to dismiss his third appointed counsel with these words:  "With you

questioning your lawyer's trial skills and even character, and threatening in advance [of trial] an

ineffective assistance of counsel complaint against her service, I do not see how it would be in

her best interests or the Court's best interests, to have her continue to represent you."  (Id. at 3).

Petitioner also used the Mimms Inquiry Hearing as an opportunity to lay out his defense

in open court, including that there was no drug conspiracy because he gave SA Tadeo "fake

names" in order to get out of jail.  (Id. at 18-19).  Thereafter, the grand jury returned a

superseding bill of indictment ("SBI"), which is the same as the original indictment except that the SBI removed the names from Count One that Petitioner now stated were fictitious. (Id., Doc. No. 56: Superseding Bill of Indictment). The next day, the Court appointed Attorney Angela Parrott with the Federal Defenders Office as Petitioner's fourth lawyer. (Id., Doc. No. 55). Federal Defender Kevin Tate entered his appearance as Attorney Parrott's co counsel on December 15, 2005. (Id., Doc. No. 57).

The first motion filed by Petitioner's new counsels was a motion to suppress evidence. (Id., Doc. No. 63: First Motion to Suppress Evidence Obtained in Violation of Fourth Amendment). The motion to suppress alleged that CMPD officers had illegally seized the Government's most critical evidence in its case-in-chief—the cocaine and guns—from Petitioner's gold SUV on May 17 and 26, 2004. (Id.). United States Magistrate Judge David Keesler held an evidentiary hearing on the defense motion, during which Attorneys Parrott and Tate cross examined SA Tadeo and two CMPD officers. (Id., Doc. No. 72: Supp. Tr. at 33-57; 78-87; 96-106). Magistrate Judge Keesler denied the motion to suppress, finding that the CMPD officers had a reasonable and articulable suspicion that Petitioner was transporting weapons and drugs in his vehicle. (Id., Doc. No. 73). Attorneys Parrott and Tate filed objections to Judge Keesler's recommendation, which this Court denied upon a de novo review.

In addition to the motion to suppress, Attorneys Parrott and Tate also filed a Motion in Limine to Preclude Propensity Evidence and Evidence of Unrelated Drug Conspiracies, (id., Doc. No. 80); a Motion to Dismiss Count Two for Destruction of Evidence, (id., Doc. No. 82); and a Motion to Preclude Drug Analysis Testimony and For a Daubert Hearing ("Daubert Motion), (id., Doc. No. 84). In their Daubert motion, Petitioner's counsels challenged the

science under which the crack cocaine found in Petitioner's SUV was tested and the qualifications of the forensic chemist who did the testing.  (Id.).  On November 27, 2006, this Court held a hearing on Petitioner's <u>Daubert</u> Motion as well as his Motion to Dismiss Count Two because the drugs at issue were destroyed after testing.  During the hearing, Attorney Tate cross-examined the Government's expert chemist at length.  (Id., Doc. No. 92 at 34-64).  This Court denied the defense motions and the trial began the following day.  <u>See</u> (Id. at 69-70).

The parties selected a jury on the morning of November 28, 2006, with trial beginning that afternoon.  (Id., Doc. No. 103 at 6-62: Trial Tr.).  In her opening statement, Attorney Parrott forecasted the defense case: she attacked the credibility of the CI, faulted the investigating agents for not interviewing all passengers in Petitioner's vehicle, and argued that Petitioner should be found not guilty on all the charges.  (Id., Doc. No. 103 at 80-86).  Over the next three days, Attorneys Parrott and Tate cross-examined nine government witnesses at length, most of all SA Tadeo.  (Id., Doc. Nos. 103-106).

During cross-examination of SA Tadeo, Attorney Tate was able to elicit much of the defense that Petitioner raised in the Mimms Inquiry Hearing.  Attorney Tate questioned SA Tadeo on the truthfulness of Petitioner's initial confession and grilled him on other steps he could have taken to corroborate Petitioner's confession, particularly the identity of the alleged conspirators Petitioner now claims are "make-believe."  (Id., Doc. No. 103 at 202; 322-23).  SA Tadeo conceded that Petitioner had recanted parts of his confession such as the drug amounts.  (Id., Doc. No. 104 at 323).  The Court sustained a Government hearsay objection when Attorney Tate attempted to impeach SA Tadeo with a transcript of Petitioner's unsworn statements at the Mimms Inquiry Hearing.  (Id., Doc. No. 104 at 322-25).  Counsels later employed a novel legal

argument in a second attempt to admit Petitioner's statements made at the Mimms Inquiry Hearing as a substitute for his sworn testimony. (Id., Doc. No. 105 at 1-22).

Before the defense rested, the Court questioned Petitioner about his decision not to testify on his own behalf. (Id. at 23-24). Petitioner stated he understood that he had a right to testify on his own behalf and that it was his "personal decision" to remain silent. (Id. at 24). He also said he understood that if he testified the Government could cross-examine him on subjects related to the case, including his prior drug felonies. (Id.). After this inquiry, Attorney Tate told the Court the defense had made the decision not to present any witnesses in order to hold the government to its burden of proof beyond a reasonable doubt. (Id. at 25). In his closing argument, Attorney Tate made it clear that it was a tactical decision not to call witnesses in the defense's case so as to highlight those witnesses the Government failed to call. (Id. at 60).

Attorney Tate continued the defense's theme by arguing that the Government's CI and, hence, their entire case, could not be trusted—as evidenced by the Government's failure to call the CI, Damon Chamberlain, as their witness. (Id. at 61). Attorney Tate characterized Petitioner's admissions to SA Tadeo as desperate exaggerations designed to appease an overzealous government agent in order to gain his freedom. (Id. at 62-68). Tate also emphasized the point that law enforcement agents did not interview the passengers in Petitioner's SUV. (Id. at 71-73).

On December 1, 2006, the jury found Petitioner guilty of all eight-counts. (Id., Doc. No. 90: Jury Verdict). The jurors also found beyond a reasonable doubt that it was foreseeable to Petitioner that the conspiracy involved five kilograms or more of crack. (Id.). On April 26, 2007, a United States Probation Officer ("USPO") completed Petitioner's Pre- Sentence Report

("PSR"), in which she found that Petitioner was facing a statutory mandatory life sentence on Count One because of the prior drug felonies in the Section 851 notices. (Id., PSR at ¶ 113). Even without the statutory life term, Petitioner's prior convictions—including several not noticed under Section 851—qualified him as a "career criminal" under the Guidelines. (Id., PSR at ¶¶ 33; 46). Attorneys Parrott and Tate filed eleven objections to the PSR, including that two of Petitioner's prior drug convictions should not be counted separately as they were consolidated for sentencing.

This Court held a sentencing hearing on December 11, 2007, during which Attorneys Parrott and Tate challenged two of Petitioner's Section 851 drug convictions from 1991 and 1992 on the grounds that Petitioner was not represented by counsel when he pleaded guilty to them in a consolidated state court hearing. (Id., Doc. No. 107 at 15-39: Sentencing Hrg. Tr.). The USPO, however, produced records showing that Petitioner did have counsel, except for a brief period of time before he entered his guilty pleas. (Id.). This Court found that because Petitioner had counsel when he entered his guilty pleas in the North Carolina state court, those convictions could be considered as part of his criminal history in this case. (Id. at 47-48).

The Court, however, granted a defense objection claiming that the penalty for the conspiracy charged in Count One should be limited to 30 years because the jury had not been properly instructed on the criminal liability of conspirators. (Id. at 71). The Court denied the other defense objections to the PSR and found Petitioner's Guidelines range to be 262 to 327 months in prison, plus mandatory consecutive prison terms for the gun offenses. (Id. at 74). Petitioner read a statement before his sentence was announced in which he repeated his claim that he made up the names of drug dealers to appease SA Tadeo, asserted that two fugitives from

New York planted the guns in his vehicle, and blamed SA Tadeo for tampering with evidence at his trial. (Id. at 75-82). Finding that Petitioner's statement and his behavior demonstrated a total lack of rehabilitative potential, this Court sentenced him to a total term of 687 months in prison. (Id. at 86).

Petitioner timely filed a Notice of Appeal with the Fourth Circuit Court of Appeals. (Id., Doc. No. 101). Attorneys Parrott and Tate were initially appointed to represent Petitioner on his appeal, but on February 8, 2008, Attorney Matthew Segal with the Federal Defender's Asheville Office entered his appearance on behalf of Petitioner and handled all aspects of his direct appeal. (Id., Doc. No. 5). Attorney Segal filed a 47-page brief in which he argued three main issues on Petitioner's behalf: (1) whether the district court erred by allowing SA Tadeo to give both expert and fact testimony; (2) whether the district court improperly excluded Petitioner's unsworn statements from the Mimms Inquiry Hearing; and (3) whether this Court should have denied the defense motion to suppress evidence base on CMPD officers' search of Petitioner's SUV on May 17 and 26, 2004. Attorney Segal also filed a brief in reply to the Government's Response. On May 14, 2009, Attorney Segal orally argued Petitioner's case to the Fourth Circuit. The Fourth Circuit affirmed Petitioner's conviction and sentence in an unpublished per curiam opinion issued on July 6, 2009. United States v. McRae, 336 F. App'x 301 (4th Cir. 2009). A petition for writ of certiorari was filed on Petitioner's behalf with the Supreme Court. The Supreme Court denied Petitioner's writ on January 11, 2010. McRae v. United States, 558 U.S. 1134 (2010).

Petitioner timely submitted the instant pro se motion on January 3, 2011. Attorneys Parrott and Tate submitted affidavits in which they denied Petitioner's claims, including that they

did advise him of the Government plea offer and did not assure him that he would be acquitted of any count.  (Doc. No. 5-1 at ¶ 4: Parrott Aff.; Doc. No. 5-2 at ¶ 4: Tate Aff.).  Both attorneys stated that they explained the terms of the Government's plea offer to Petitioner and advised him to take it "because the risk of a life sentence was too great if he proceeded to trial."  (Id.).  They said that they did not call witnesses suggested by Petitioner because they determined that the witnesses' testimony would likely harm Petitioner's defense.  (Doc. No. 5-1 at ¶ 8; Doc. No. 5-2 at ¶ 8).  Attorney Parrott provided a Supplemental Affidavit in which she attested that she had no recollection of Dante Dillard, whom Petitioner claims was a passenger who left guns in his SUV before it was searched on May 16, 2004.  (Doc. No. 5-3 at ¶¶ 4-5).

Attorney Matthew Segal submitted an affidavit in which he stated that he was Petitioner's counsel on direct appeal.  (Doc. No. 5-4 at ¶ 3).  Attorney Segal had several telephonic and written communications with Petitioner concerning the issues to be raised on appeal, including sufficiency of the evidence.  (Id. at ¶ 6).  Attorney Segal used his professional experience and judgment to select three issues which sought reversal on five of Petitioner's eight convictions.  (Id. at ¶ 9).  Attorney Segal did not believe that he was required to advance every argument "urged" by Petitioner, regardless of merit.  (Id. at ¶ 8).  Attorney Segal also does not believe it would have been in Petitioner's best interests to advance every argument he suggested, nor does he believe that raising other issues would have improved Petitioner's chances for a successful appeal.  (Id. at ¶ 10).

On April 29, 2011, Respondent filed a motion for summary judgment.  On April 29, 2011, the Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of his obligation to file a response to the motion for summary

judgment. (Doc. No. 7). On July 27, 2011, Petitioner filed a Response to Respondent's Motion for Summary Judgment. (Doc. No. 19). In his motion to vacate and the supporting memorandum, Petitioner identifies and argues numerous grounds for relief based on ineffective assistance of trial and appellate counsel.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  <u>Anderson</u>, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmovingq party, there is no genuine issue for trial.'"  <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658, 2677 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

**III.    DISCUSSION**

**A.    Petitioner's Claim of Ineffective Assistance of Trial Counsel by Attorneys Parrott and Tate**

Petitioner alleges six ineffective assistance of counsel claims against trial counsels Parrott and Tate.  The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  <u>See</u> U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id.</u> at 689; <u>see also</u> <u>United States v. Luck</u>, 611 F.3d 183, 186 (4th Cir. 2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'"  <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998) (quoting <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  <u>Bowie v. Branker</u>, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance

prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

1.     Whether Attorneys Parrott and Tate properly and adequately advised Petitioner's decision to exercise his right to a jury trial and forego a plea offer.

Petitioner first complains that if counsels Parrott and Tate had "properly advised [him] related to his criminal case, there is a reasonable probability that [he] would have pled guilty instead of going to trial . . . ." (Doc. No. 1-1 at 7). Petitioner states that he "was never clearly advised with respect to the government's various plea offers and was left with the believe (sic) that a sentence of 30 years would be the absolute minimum sentence pursuant to the plea offers." (Id. at n.5 (citing Pet. Aff. at ¶¶ 4-29)).

Petitioner's claim fails. First, Petitioner's own exhibits to his motion to vacate contain a letter dated January 12, 2006, from Attorney Parrott to Petitioner, advising Petitioner of the Government's plea offer, including the Government's statement that it would not accept a sentence of less than twenty years. See (Doc. No. 1-3). Furthermore, Attorneys Parrott and Tate have stated in their affidavits that they informed Petitioner of the terms of the government's plea offer orally and in writing and gave him their opinion as to the strengths and weaknesses of the Government's case. Furthermore, even if counsels incorrectly stated the statutory minimum punishment for several counts, they correctly advised Petitioner that the government would not accept less than a 20-year prison term under any plea offer. Counsel also accurately predicted that Petitioner would receive a life term if he were convicted at trial.

Finally, Petitioner has not shown that he was prejudiced by any error in trial counsels' advice because the record evidence shows that he would not have pleaded guilty as he now

claims, even if counsels had given Petitioner different advice. Before attorneys Parrott and Tate were appointed, Petitioner had dismissed three other experienced attorneys because they had advised him to plead guilty. When each counsel was removed, Petitioner told the Court that he wanted a lawyer who would take his case to trial. During the Mimms Inquiry Hearing, Petitioner explicitly stated in open court that he was not going to plead guilty "to something I'm not responsible for." (Criminal Case No. 3:04cr157, Doc. No. 74 at 5: Inquiry Into Status of Counsel Hearing Transcript). Petitioner stated, "Whether I get life or ten life sentences for it [conviction on the indictment], I'm not going to do it [plead guilty]." (Id.). In sum, Petitioner has not shown ineffective assistance of trial counsel based on the advice from Attorneys Parrott and Tate regarding whether Petitioner should plead guilty.

      2.      Whether Attorneys Parrott and Tate failed to properly review discovery and evidence with Petitioner before his decision to go to trial.

Next, Petitioner complains that Attorneys Parrott and Tate were ineffective because they failed to review certain discovery and evidentiary materials with him before trial. (Doc. No. 1-1 at 9-10). Specifically, Petitioner alleges that counsels never gave him the opportunity to hear the Bi-Lo recording or transcript before trial. (Id.). Petitioner claims that if he had heard the Bi-Lo recording before trial he would have demanded an expert evaluation of the recording or he might have considered the Government's plea offer. (Id. at 9). Petitioner contends that the CI Chamberlain, not Petitioner, sold crack to Detective Ortiz. (Id.).

Petitioner's claim fails. First, Attorneys Parrott and Tate have presented evidence showing that they adequately reviewed the evidence with Petitioner before he decided to go to trial, and this evidence included the Bi-Lo recording. (Doc. No. 5-1 at ¶ 7: Parrott Aff.; Doc. No.

5-2 at ¶ 7: Tate Aff.).  Second, Petitioner has failed to present any evidence showing that anyone tampered with the Bi-Lo recording or its transcript, and a live witness to the Bi-Lo transaction–Detective Ortiz–testified that the recording and transcript were accurate.  Detective Ortiz identified Petitioner as the individual who handed him crack cocaine in the Bi-Lo parking lot in exchange for $900.  (Doc. No. 104 at 156-60).  Detective Ortiz testified that he not only personally observed and participated in the drug deal with Petitioner, but that he also prepared a recording and made a written transcript from it.  (Id. at 175).  The Court found Detective Ortiz was qualified to make both the recording and transcript.  (Id. at 176).

Regardless of whether Parrott and Tate reviewed the contents of the Bi-Lo recording with Petitioner, they assessed the strength of the Government's proof on Count Two—which alleged Petitioner's possession of crack cocaine on that day–and advised Petitioner that he had no defense to that count.  (Id.).  The cross-examination of Detective Ortiz shows that Attorney Tate had reviewed the tape in detail before Petitioner's trial.  See (Id. at 183-96).  Furthermore, during his cross-examination of Detective Ortiz, attorney Tate pointed out inaudible portions of the tape in an attempt to show that Petitioner was speaking about marijuana and not cocaine.  See (Id.).  In sum, attorneys Parrott and Tate obviously made the reasonable tactical decision that it would be fruitless to challenge the authenticity of a recording that was supported by the eyewitness testimony of a participant and by corroborating admissions from Petitioner.

Third, even assuming that Petitioner did not hear the tape or review its transcript before trial, he fails to show how he was prejudiced at trial or in his decision to reject the Government's plea offer.  Petitioner told five defense attorneys, a district court judge, and two U.S. magistrate judges that he would not plead guilty under any circumstances.  There is nothing to indicate that

Petitioner would have accepted a plea bargain based on one recording after refusing to accept any deal for over two years.

      3.      Whether Attorneys Parrott and Tate failed to adequately prepare and investigate Petitioner's criminal case and defend Petitioner at trial by deciding not to interview and call certain defense witnesses at trial.

In his third contention, Petitioner argues that his trial counsel failed to (a) interview certain witnesses with regard to the Bi-Lo transaction charged in Count Two and (b) investigate other occupants of the vehicle during CMPD's stop and search of Petitioner's SUV on May 17, 2004. (Doc. No. 1-1 at 10-12). Petitioner alleges that he gave Attorneys Parrott and Tate the names of two witnesses–Rosa Grissom and Damon Chamberlain–who would support Petitioner's contention that Damon Chamberlain, and not Petitioner, sold crack cocaine to Detective Ortiz at the Bi-Lo on April 16, 2004. (Id. at 10-11).

Petitioner's contention is without merit, as attorneys Parrott and Tate made a reasonable, strategic choice not to call the witnesses suggested by Petitioner. Attorneys Parrott and Tate state in their affidavits that they "did not call witnesses that [Petitioner] suggested, because after [their] investigation it was determined that the witnesses testimony would likely harm [Petitioner's] defense." (Doc. No. 5-1 at ¶ 8; Doc. No. 5-2 at ¶ 8). Pre-trial discovery revealed that (1) SA Tadeo recorded the CI's cell phone conversation in which Petitioner agreed to set up a crack deal; (2) the government had another recording of Petitioner's sale of crack in the Bi-Lo parking lot recorded by a body wire worn by Detective Ortiz; and (3) Detective Ortiz was an eyewitness who would identify Petitioner as the individual to whom he gave $900 in exchange for around 28 grams of crack cocaine. See (Doc. No. 5-5: Letter dated May 18, 2006,

forwarding "McRae Drug Deal Audio"). Furthermore, Petitioner does not dispute that he was in the Bi-Lo parking lot during the drug deal. (Doc. No. 1-2 at ¶¶ 36-38).

As to trial counsels' decision not to call Damon Chamberlain as a witness, the prosecution could have exploited Chamberlain's prior drug arrests, his cooperation with SA Tadeo, and his long friendship with Petitioner if Chamberlain had been called as a witness to testify at trial. Furthermore, if Chamberlain were called as a defense witness, prosecutors could have elicited from Chamberlain all the prior times in which Petitioner bought or sold drugs in Chamberlain's presence.

As to trial counsels' failure to call Rosa Grissom as a witness, Rosa Grissom's story that she overheard Chamberlain calling Petitioner for "a ride to the store in order to meet someone who owed him money" does not help Petitioner, given the Government's proof that Petitioner sold crack for $900 to Detective Ortiz at the Bi-Lo parking lot in Chamberlain's presence.[2] See (Doc. No. 1-4 at ¶ 3: Rosa Grissom Aff.). In sum, Petitioner's ineffective assistance of counsel claim based on trial counsels' failure to have Chamberlain or Grissom testify at trial is without merit.

Petitioner also alleges that counsel was ineffective because they failed to investigate whether other occupants in Petitioner's SUV planted the guns and cocaine found in Petitioner's vehicle on May 17, 2004. (Doc. No. 1-1 at 11). In support of this claim, Petitioner provides an affidavit by Dante Dillard on December 27, 2010, in which Dillard asserts that he was in Petitioner's SUV just before it was searched. (Doc. No. 1-6 at ¶ 3: Dante Dillard Aff.). Dillard

---

[2] Respondent contends furthermore that Grissom's testimony would have been inadmissible hearsay.

claims that he placed two guns and bullets in the center console of Petitioner's SUV just before the search and without Petitioner's knowledge.  (Id. at ¶¶ 5-6).

Petitioner's contention is without merit.  On the day the vehicle was searched, Petitioner admitted to SA Tadeo that the drugs found in the SUV were his, as well as the .40 caliber pistol, which "is always in the vehicle."  (Doc. No. 104 at 328).  At that time, he claimed that the .357 magnum found with the drugs and the .40 caliber pistol "must have been put in there by his sister's boyfriend who sometimes uses the car."  (Id. at 329).  Furthermore, Attorney Parrott states in her supplemental affidavit that she did not have any recollection of hearing about a man named Dante Dillard during the time she represented Petitioner.  (Doc. No. 5-3 at ¶ 4: Parrott Supp. Aff.).  At that time, Attorneys Parrott and Tate knew only that (1) there was a recorded call in which Petitioner agreed to sell the CI a "three pounder"; (2) Petitioner was arrested en route to the proposed location of the sale with a .357 magnum in the center console of his SUV; (3) Petitioner had previously admitted that the cocaine and at least one of the guns was his; and (4) guns and drugs were found in the same place in Petitioner's SUV when he was arrested a second time with no passengers in his vehicle.  Given this evidence, Dillard's contention that he placed two guns and bullets in the center console of Petitioner's SUV just before the search and without Petitioner's knowledge is simply not credible, and trial counsels' failure to investigate whether other occupants in Petitioner's SUV such as Dillard planted the guns and cocaine found in Petitioner's vehicle on May 17, 2004, did not constitute ineffective assistance of counsel.[3]

As to Rosa Grissom, she was not present at the Bi-Lo for the drug deal, and her story that

_____

[3]  In any event, Dillard's affidavit does not even fully exculpate Petitioner in that he does not admit to putting the cocaine in Petitioner's SUV.

she saw Damon Chamberlain with $850 is consistent with Detective Ortiz' testimony that he paid Petitioner $900 in Damon Chamberlain's presence.  See (Doc. No. 1-4 at ¶¶ 3-6).  Even if attorneys Parrott and Tate had known about Dante Dillard, calling him as a defense witness would risk damaging testimony about why he was driving around in Petitioner's SUV with two guns and crack cocaine.

Instead of risking the admission of testimony harmful to Petitioner, trial counsels focused the jury's attention on the potential witnesses that the Government failed to present.  Specifically, Attorney Tate called the jury's attention to the fact that the Government failed to call CI Chamberlain to testify.  (Criminal Case No. 3:04cv157, Doc. No. 105 at 61).  Tate also stressed law enforcement officers' failure to question the passengers in Petitioner's car during the May 17, 2004, traffic stop.  (Id. at 71-73).  In sum, trial counsels' choice not to call Petitioner's recommended witnesses was a reasonable, discretionary tactic.  See Jones v. Murray, 947 F.2d 1106 (4th Cir. 1991).

4.   Whether Attorneys Parrott and Tate failed to defend Petitioner at trial by deciding not to procure independent experts to analyze audio recordings admitted as evidence at trial.

Petitioner's fourth complaint against attorneys Parrott and Tate essentially repeats his second contention concerning the Bi-Lo recording.  Since the recordings offered at trial did not appear to be altered or missing any portions, Attorneys Parrott and Tate had the discretion as to whether procuring an outside opinion was necessary.  In sum, it was not unreasonable for trial counsels to forego expert examination of the Bi-Lo or other Government recordings.

5.   Whether Attorneys Parrott and Tate deprived Petitioner of his Constitutional right

to testify on his own behalf at trial.

Next, contrary to Petitioner's clear statements to the Court that he did not want to testify on his own behalf, Petitioner now asserts that his lawyers prevented him from testifying at trial. This contention is without merit. In their affidavits, Attorneys Parrott and Tate state that they advised Petitioner of his right to testify at trial. (Doc. No. 5-1 at ¶ 4, Doc. No. 5-2 at ¶ 4). Both attorneys advised Petitioner not to testify, as it could "hurt the defense presented." (Doc. No. 5-1 at ¶ 10, Doc. No. 5-2 at ¶ 10). Ultimately, however, they left the decision up to Petitioner, and Petitioner chose to follow their advice. Additionally, at trial, Attorney Tate asked that the Court to conduct an inquiry "on the record . . . as to whether [Petitioner] wishes to testify in this matter . . . ." (Criminal Case No. 3:04cr157, Doc. No. 105 at 24). After the Court asked six explanatory questions and made two clarifying statements, Petitioner expressed his desire not to testify. (Id. at 24-25). Petitioner stated, "I will not [take the stand]" and "I choose not to." (Id. at 25).

Petitioner asserts that he was "misled" into waiving his right to testify by his counsels' promise that they would tell the jury his "side of the story" in their closing argument. (Doc. No. 1-2 at ¶ 30). Since there was no credible evidence to support this story, Attorney Tate's closing focused on exposing the few holes in the Government's case, specifically calling into question the trustworthiness of the Government's absent CI. (Criminal Case No. 3:04cr157, Doc. No. 105 at 60-61). Tate attempted to explain Petitioner's confession to SA Tadeo as a desperate ploy to appease a relentless agent. (Id. at 62-68). The affidavits provided by trial counsels and Petitioner's colloquy before this Court show that Petitioner was informed of his right to testify on his own behalf or to remain silent at trial. (Id. at 578-79). Petitioner has simply not shown

that his trial counsels "prevented" his testifying at trial. Accordingly, Petitioner's claim for ineffective assistance of counsel fails as to this issue.

6. Whether Attorneys Parrott and Tate failed to make "proper" objections and arguments at Petitioner's sentencing hearing.

In his final claim against Attorneys Parrott and Tate, Petitioner asserts that they should have objected to the use of his prior drug convictions as a basis for the Court's determination that he is a "career offender" under U.S.S.G. § 4B1.1. (Doc. No. 1-1 at 14). Petitioner cites <u>United States v. Brandon</u>, 247 F.3d 186, 196-97 (4th Cir. 2001), to support his argument that two of his convictions should not have been counted because they were not "'controlled substance' offenses as required for application of [U.S.S.G.] § 4B1.1." (<u>Id</u>.). Petitioner does not specify which of his six prior convictions counsels should have contested on these grounds, but he states that "[b]oth of the prior convictions used [as a basis for his career offender status] involved only .04 and 1.5 grams of crack cocaine (which [Petitioner] was addicted to at the time)." (<u>Id</u>. at 15).

<u>Brandon</u> does not apply. In <u>Brandon</u>, the Fourth Circuit held that a drug defendant's prior conviction under North Carolina General Statutes § 90-95(h)(3) could not be considered a "serious drug offense" as that term is defined in 21 U.S.C. § 924(e)–the Armed Career Criminal ("ACC") statute–because the North Carolina statute could be violated by possessing minor amounts of cocaine, as well as trafficking and distributing cocaine. <u>Brandon</u>, 247 F.3d at 188, 196. Petitioner was not sentenced, however, as an "Armed Career Criminal" under Section 924(e), but as a "Career Criminal" under U.S.S.G. § 4B1.1. <u>See</u> (Criminal Case No. 3:04cr157, PSR at ¶ 113). <u>Brandon</u> does not apply to the definition of a "controlled substance offense" under U.S.S.G. § 4B1.1. Section 4B1.1 of the Guidelines provides that a defendant is a career

offender if (1) the defendant was at least 18 years old at the time of the instant offense; (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has a least two prior convictions of either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a) (Nov. 1, 2007). "The term 'controlled substance offense' means an offense under federal or state law, punishable by imprisonment for a term exceeding one-year, that prohibits . . . possession of a controlled substance . . . with intent to manufacture, import, export, distribute or dispense." U.S.S.G. § 4B1.2 (Nov. 1, 2007). See also United States v. Harp, 406 F.3d 242, 245 (4th Cir. 2005).

Here, Petitioner's PSR lists six prior convictions that qualified him for "Career Offender" status: four prior convictions for Possession with Intent to Distribute Cocaine (1991, 1992, 1993 and 2000), one for Sale and Delivery of Cocaine (1993), and one for Common Law Robbery (1994). See (Criminal Case No. 3:04cr157, PSR at ¶¶ 46; 53; 55; 58; 59; 61). Presumably, the two convictions Petitioner references in his Section 2255 Motion were for his violations of North Carolina General Statute 90-95(a)(1)—prohibiting "Possession with Intent to Sell or Deliver Cocaine"—on September 6, 1991 and December 9, 1992. See (Doc. No. 5-6: State v. McRae, Nos. 92 CrS 75501, 91 CrS 60093, 92 CrS 65009, 93 CrS 24176, Judgment and Commitment Order (Guilford County Superior Court, (Feb. 18, 1993)). Both offenses are Class H felonies punishable by a maximum term of ten years imprisonment. See N.C. Gen. Stat. § 15A-1340.1 (repealed 1993). Because Petitioner's 1991 and 1992 drug offenses include "possession with intent to distribute" and the maximum penalty exceeds one year, they qualify as "controlled substance offenses" no matter the quantity of drugs involved. Nevertheless, Attorneys Parrott and Tate were successful in their argument that the maximum penalty for Count One should not

be more than thirty years because the vicarious liability (Pinkerton) instruction required by the Fourth Circuit in drug cases was not given in this case.  (Criminal Case No. 3:04cr157, Doc. No. 107 at 53-68: Sent. Tr.; PSR at 26-27).  Because of counsels' objection, Petitioner's statutory sentence was reduced from mandatory life to a Guidelines sentence of 360 months to life, not including the statutory sentences for his two weapons-related convictions under Section 924(c). (Id. at 69).

Even assuming that Attorneys Parrott and Tate were somehow deficient in failing to suppress the two drug convictions noticed under Section 851 on the basis of Petitioner's underlying conduct, it would not have made any difference to Petitioner's career offender status or his ultimate sentence.  As noted above, Petitioner's Guideline sentence was not based solely on his two Section 851 convictions.  Petitioner had at least two, additional prior convictions that would qualify him for career offender status, including a 1993 conviction for the Sale and Delivery of Cocaine for which he was sentenced to ten years in prison and a 1994 Robbery Conviction for which he was sentenced to ten years concurrent with his 1993 conviction. (Criminal Case No. 3:04cr157, PSR at ¶¶ 46; 58-59).  Because "career criminal" status under Section 4B1.1 requires only two prior convictions "of either a crime of violence or a controlled substance," both of these additional convictions would have qualified regardless of whether the Court considered any of the convictions noticed under Section 851.  See U.S.S.G. § 4B1.1(a). Thus, Petitioner cannot show that he was prejudiced by Attorneys Parrott's and Tate's representation at sentencing and this claim fails.

**B.    Petitioner's Claim of Ineffective Assistance of Appellate Counsel by Attorney Matthew Segal**

In his Section 2255 Motion, Petitioner next alleges that his appellate counsel Matthew Segal was ineffective for failing to brief and argue insufficiency of the evidence and "issues of merit preserved by trial counsels." (Doc. No. 1 at 5). The test for ineffective assistance of appellate counsel is the same as it is for trial counsel. Specifically, "to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate (1) that his counsel's performance fell below an objective standard of reasonableness in light of the prevailing norms, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (internal citations and quotation marks omitted). Appellate counsel is entitled to a "presumption that he decided which issues were most likely to afford relief on appeal." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" Smith v. Robbins, 528 U.S. 259, 288 (2000) (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

1. Attorney Segal's decision regarding which claims to raise on appeal.

Petitioner first complains that Attorney Segal should have raised certain claims on appeal that he did not raise. This contention is without merit. First, Attorney Segal argued three specific claims: (1) the district court improperly admitted confusing and overbroad dual-role testimony; (2) the district court should have permitted the defense to show that SA Tadeo knew about Petitioner's recantation; and (3) the district court erroneously denied McRae's motion to suppress evidence obtained from CMPD's search of his vehicle. (Case No. 08-4112, 4th Cir., Doc. No. 17: Appellant Br. i-ii; Doc. No. 5-4 at ¶ 9: Segal Aff.). Attorney Segal had

professional discretion to "select from among [critical issues] in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 287 (2000). Attorney Segal attests that he spoke with Petitioner on several occasions about which grounds to raise on appeal, including the sufficiency of the Government's trial evidence. (Doc. No. 5-4 at ¶ 9). He "conferred with several colleagues" about legal arguments that would best advance Petitioner's cause. (Id. at ¶ 7). After his discussions with Petitioner and other counsel, Attorney Segal purposefully chose the three issues most likely to result in a new trial. He excluded others that did not have merit or were not as likely to be successful. (Id. at ¶¶ 8; 10). Attorney Segal then comprehensively researched, briefed, and argued the three issues he selected in a 47-page opening brief, supported by a four-volume, 1375-page, Joint Appendix. (Id. at ¶ 9; Case No. 08-4112, Doc. No. 17, 4th Cir.: Appellant Brief, (May 30, 2008); Doc. No. 18, 4th Cir.: Joint Appendix, (May 30, 2008). Segal filed a reply brief in response to the Government's brief and a supplemental letter under Rule 28(j) of the Federal Rules of Appellate Procedure. (Id., Doc. No. 35, 4th Cir.: Appellant's Reply (Sept. 2, 2008); Doc. No. 44, 4th Cir.: Appellant's Supplemental Authorities (Mar. 27, 2009). Attorney Segal also orally argued Petitioner's case to a three-judge panel of the Fourth Circuit Court of Appeals. (Doc. No. 5-4 at ¶ 12).

Despite Attorney Segal's efforts, the Fourth Circuit affirmed Petitioner's conviction and sentence on July 6, 2009. Petitioner's disagreement with the Court's opinion, however, is not a sufficient basis for his ineffective assistance claims against Attorney Segal. Petitioner's claims fail because he shows no evidence of unreasonable action or improper omission by Attorney Segal.

2. Attorney Segal's decision not to raise a claim for insufficiency of the evidence on

appeal.

Petitioner next alleges that Attorney Segal was ineffective because he did not argue insufficiency of the Government's trial evidence on appeal.  (Doc. No. 1 at 6).  This contention is without merit.  A party challenging the sufficiency of evidence bears "a heavy burden."  United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995).  When looking at the sufficiency of evidence, the reviewing court must examine all evidence in a light most favorable to the verdict rendered.  United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997).  A criminal conviction can be overturned for insufficiency of the evidence only where "the prosecution's failure is clear."  Id. (quoting Burks v. United States, 437 U.S. 1, 17 (1978)).

Here, Attorney Segal's decision not to broadly argue insufficiency of the evidence at trial was reasonable and sound strategy, as the Government's evidence against Petitioner was overwhelming.  The undisputed evidence included video surveillance of Petitioner's meeting with his drug supplier "Uncle," a recorded telephone conversation in which Petitioner arranged for the sale of an illegal gun, and testimony of eight Government witnesses besides SA Tadeo.  Since there was direct evidence of every transaction charged, an argument that the trial evidence was insufficient would not only have been frivolous, but it also would have likely reduced Attorney Segal's ability to effectively argue more meritorious issues.  In sum, Petitioner has not shown that he received ineffective assistance of appellate counsel based on Attorney Segal's failure to argue sufficiency of the evidence on appeal.

3. Attorney Segal alleged failure to argue "issues of merit" preserved by trial counsels.

Petitioner next claims Attorney Segal failed to argue issues of merit preserved by Petitioner's trial counsels.  (Doc. No. 1 at 6).  However, all three of the issues raised by Attorney

Segal were issues preserved by the objections of his trial counsel.  Furthermore, to the extent that Petitioner did not argue all of the issues that trial counsels had preserved at trial, as the Court has noted, Attorney Segal's strategic decision which issues to raise on appeal was reasonable.  In sum, this part of Petitioner's ineffective assistance of appellate counsel claim fails.

4. Petitioner fails to show how he was prejudiced by any act or omission of Attorney Segal.

Finally, the Court notes that to prevail on his claims against Attorney Segal, Petitioner must prove that, but for counsel's choice of appellate issues, the Fourth Circuit would have ruled in Petitioner's favor.  Strickland, 466 U.S. at 695.  Here, even if Petitioner could show that Attorney Segal's performance was deficient, Petitioner cannot show that Segal's performance prejudiced Petitioner.   Therefore, Petitioner's ineffective assistance of appellate counsel claim fails.

**C. Petitioner's Claim for Sentence Reduction under The Fair Sentencing Act of 2010**

In his third ground, Petitioner requests a reduced sentence based on the Fair Sentencing Act of 2010 ("FSA").  (Doc. No. 1 at 8).  As part of this claim, Petitioner argues that this Court should reduce his sentence based on the "[p]ublic's shifting opinion about confining young men for extended periods of incarceration for crack cocaine law violations."  (Id.).  Petitioner's FSA claim is without merit.  The FSA, which took effect on August 3, 2010, increased the drug amounts necessary to trigger the statutory minimum and maximum penalties for crack cocaine.  On June 21, 2012, the Supreme Court held in Dorsey v. United States that the FSA's "new, lower mandatory minimums . . . apply to the post-Act sentencing of pre-Act offenders."  132 S.

Ct. 2321, 2335 (2012). Because Petitioner's offenses and sentencing both predated the effective date of the FSA, Petitioner is not entitled to a sentence reduction under the FSA. In any event, this Court has already held in a prior Order on Petitioner's pro se motion to reduce sentence under 18 U.S.C. § 3582 that Petitioner is ineligible for relief under the FSA because he is a career offender. (Criminal Case No. 3:04cr157, Text Order dated Sept. 6, 2012).

As to Petitioner's contention that he should receive a reduced sentence based on "the [p]ublic's shifting opinion" with regard to long-term incarceration for crack cocaine offenders, even if Petitioner's perception of public opinion is accurate, he has not shown that it would apply to him or his offenses. As noted, a large component of Petitioner's lengthy sentence was his status as a "career offender" under U.S.S.G. § 4B1.1, not because the drug-trafficking conviction involved crack cocaine. Petitioner's FSA claim is simply without merit.

## IV. CONCLUSION

In sum, for the reasons stated herein, the court finds that Petitioner's claims in his Section 2255 motion are without merit and the court will, therefore, grant summary judgment to Respondent.

**IT IS, THEREFORE, ORDERED THAT:**

1. Respondent's Motion for Summary Judgment, (Doc. 6), is **GRANTED**; and

2. Petitioner's § 2255 Motion to Vacate, (Doc. 1), is **DENIED** and **DISMISSED**.

3.    Petitioner's Motion for Reconsideration re Order on Motion for Discovery, Order on Motion to Produce, (Doc. No. 20), is **DENIED**.

4.    Petitioner's Motion for Evidentiary Hearing, (Doc. No. 23), is **DENIED**.

5.    Petitioner's Motion for Judicial Notice for Consideration of Applying Recent Supreme Court Decision, (Doc. No. 24), is **GRANTED**.

6.    Petitioner's Motion for Entry of Default, (Doc. No. 25), is **DENIED**.

7.    Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constsitutional right.  28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: August 29, 2013

Frank D. Whitney
Chief United States District Judge

33